IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN STOUT,<br><br>        Plaintiff,<br><br>   v.<br><br>HARTFORD LIFE AND ACCIDENT INS.<br>CO. and AMAZON.COM HOLDINGS, INC.<br>LONG TERM DISABILITY PLAN,<br><br>        Defendants.<br>═══════════════════════════════/ | No. C 11-6186 CW<br><br>ORDER DENYING<br>DEFENDANTS' MOTION<br>FOR JUDGMENT AND<br>GRANTING IN PART<br>PLAINTIFF'S CROSS-<br>MOTION FOR<br>JUDGMENT (Docket<br>Nos. 50 & 57). |

Plaintiff Kathleen Stout moves for judgment on her claims for disability benefits under the Employee Retirement Income Security Act (ERISA). Defendants Hartford Life and Accident Insurance Company and Amazon.com Holding, Inc. Long Term Disability Plan cross-move for judgment. After considering the parties' submissions and oral argument, the Court grants in part and denies in part Plaintiff's motion for judgment, denies Defendants' cross-motion for judgment, and remands Plaintiff's claim to the plan administrator to determine whether Plaintiff is eligible for benefits under the "any occupation" standard.

FINDINGS OF FACT

The parties have agreed that the documents submitted with Plaintiff's motion will serve as the administrative record (AR) in this case.[1]  These findings of fact are based on that record.

---

[1] The Court notes that the AR is extremely disorganized.  Many of the documents included in this record are incomplete, unlabeled, and undated and the parties have failed to provide a useful account of when, where, or by whom most of these documents were created.  Nevertheless, because the parties have chosen to rely on this record, the Court is forced to do so, as well.

United States District Court<br>For the Northern District of California

I.   Plaintiff's Employment History & Disability Diagnoses

In 2008, Plaintiff was hired by Amazon.com to work as a senior technical program manager in Seattle, Washington.  AR 390.[2] In that role, she oversaw a team of software engineers tasked with collecting and analyzing customer data from Amazon's website and sharing that data with company executives.  Id.  Because members of her team lived in both Seattle and Romania, Plaintiff often worked long hours and traveled frequently to supervise them.  Id. She regularly worked ten- to twelve-hour days and was expected to be on call even when she was not working.  Id.

Beginning in early 2009, Plaintiff began to experience bouts of fatigue and diarrhea as well as episodes of dry eyes and dry mouth.  Id. at 1898-99.  According to her friends, family, and coworkers, she began to make uncharacteristic mental errors during this period, including simple math and spelling mistakes, and would occasionally lose her train of thought.  Id. at 390, 395-96, 399.  Plaintiff stopped working in March 2009 after her symptoms worsened.  Id. at 149.  Plaintiff was granted short-term disability benefits a few weeks later.  Id. at 149.

In May 2009, Plaintiff visited Seattle's Pacific Medical Center to seek a diagnosis.  Id. at 1894.  Her treating physician, Dr. John Yuen, concluded that Plaintiff "may either have systemic lupus erythematosus or Sjogren's syndrome.  Both of these conditions can be associated with severe fatigue, arthralgia, and some degree of cognitive disturbance, such as poor concentration and memory."  Id. at 1894.  Although Plaintiff began taking

---

[2] All page citations are to "KS" Bates-stamp numbers.

United States District Court
For the Northern District of California

medication prescribed by Dr. Yuen, her symptoms persisted.  Id. at 1891.

Later that summer, Plaintiff moved to Palo Alto, California, to begin treatment with a new rheumatologist, Dr. Christine Thornburn, and an internist, Dr. Henry Thai, at the Palo Alto Medical Foundation.  Id. at 403, 1438-87.  There, she underwent additional lab testing which confirmed that she was likely suffering from Sjogren's syndrome or a similar autoimmune disease. Id. at 1511-13.  Examinations of Plaintiff's sleeping habits a few months later, in early 2010, indicated that she was also suffering from obstructive sleep apnea.  Id. at 990, 1532-34, 1626-29. Although she was prescribed additional medication, Plaintiff continued to describe feelings of fatigue and cognitive impairment to Drs. Thornburn and Thai over the next several months.  Id. at 1438-90.

In March 2010, Plaintiff began a course of cognitive behavioral therapy with Dr. Patrick Whalen at Stanford University. Id. at 1559-73.  While these sessions focused on her mental health, she continued to report various physical ailments during this period, as well.  See id.  Dr. Whalen noted, for instance, that during one session Plaintiff said that "fatigue, feeling like she has the flu most hours most days is by far the most debilitating symptom related to her inability to work."  Id. at 1561.  According to Dr. Whalen's reports, Plaintiff continued to report similar feelings over the course of the next several months.  Id. at 739-43.

In August 2010, Plaintiff met with Dr. Peter Karzmark, a Stanford neuropsychologist.  Id. at 1414-20.  Dr. Karzmark

United States District Court
For the Northern District of California

conducted a series of tests to measure Plaintiff's cognitive abilities in the following areas: (1) concentration; (2) learning and memory; (3) problem solving, reasoning, executive abilities, and intelligence; (4) language, academic, visual-spatial, motor, and sensory-perceptual abilities; and (5) personality.  Id.  The test results revealed that, although Plaintiff's academic abilities were "above average," her "overall performance on the battery [of tests] was at the 30th percentile" for "someone of her gender, age, and education level."  Id. at 1419.  Based on these results, Dr. Karzmark concluded,

> It is my overall impression that this patient's cognitive functioning has declined to a modest extent from baseline.  Sjogren's disease has been associated with cognitive impairment, although this has not been well studied.  Her depression may also account for some portion of her cognitive limitation.

Id. at 1419-20.

The following month, in September 2010, Plaintiff began treatment with a new rheumatologist, Dr. Eliza Chakravarty, at Stanford Hospital.  Id. at 725-27, 751-52.  Dr. Chakravarty's examination reports indicate that Plaintiff was still experiencing physical symptoms during that period, including "[i]ncreased fatigue" and muscle aches.  Id. at 743.

Dr. Chakravarty referred Plaintiff to a neurologist to assess Plaintiff's cognitive impairment.  Id. at 754.  Reports from that neurologist, Dr. Elias Aboujaude, indicate that Plaintiff was still reporting fatigue, "cognitive difficulties," and "balance and coordination problems" through at least February 2011.  Id. at 736-38.

**United States District Court**
For the Northern District of California

II.  Hartford's Disability Policy

     Plaintiff was insured under Hartford's Group Policy No. GLT-675334, which was issued to Amazon.com Holdings, Inc.  Id. at 114. The Policy provides Amazon employees with coverage for long-term disability (LTD) benefits and grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all [of the Policy's] terms and provisions."  Id. at 114-16, 130.

     The Policy provides two standards for determining whether an employee is "disabled" and qualifies for LTD benefits.  Id. at 131.  The first, which is known as the "own occupation" standard, applies to LTD claims during the first two years after they are filed.  Id.  Under this standard, the employee is considered disabled if he or she is unable to perform an essential duty of his or her own occupation.  Id.  Under this standard, the employee's own occupation is defined as the employee's job "as it is recognized in the general workplace," including comparable positions with other employers.  Id. at 134.

     The second standard, known as the "any occupation" standard, governs the employee's eligibility for LTD benefits beyond the first two years of the claim.  Id. at 131.  Under this standard, the employee is only eligible for LTD benefits if he or she is unable to perform an essential duty of any occupation for which he or she is "qualified by education, training or experience" and which pays more than the employee would earn from benefits alone. Id. at 130.  In other words, to continue receiving LTD benefits beyond the first two years of a claim, the employee must either be

**United States District Court**
For the Northern District of California

unqualified for or unable to perform <u>any</u> occupation that would pay more than he or she would otherwise receive in benefits.

III. Plaintiff's Claim & Hartford's Investigation

Plaintiff initiated her claim for LTD benefits in July 2009, shortly after she received her initial diagnosis from Dr. Yuen. <u>Id.</u> at 164-65, 286-87. That same month, Hartford opened an investigation into her claim by interviewing her about her symptoms and asking her to provide supporting medical records. <u>Id.</u> at 164-65. Plaintiff submitted an attending physician's report from Dr. Yuen summarizing his diagnosis. <u>Id.</u> at 336-37. The report recommended that Plaintiff be limited to five hours of sitting, one hour of standing, and one hour of walking per day. <u>Id.</u>

On September 23, 2009, Hartford preliminarily approved Plaintiff's LTD claim. <u>Id.</u> at 275-78. It offered to pay her LTD benefits until September 30, 2009 but asked her to submit additional information, including an attending physician's report from her new rheumatologist, Dr. Thornburn, so that it could investigate whether to extend her LTD benefits beyond that date. <u>Id.</u> Hartford received Dr. Thornburn's report on October 8, 2009. <u>Id.</u> at 175, 332-33. The report stated that Plaintiff was still experiencing fatigue, "musculoskeletal pain," and "poor concentration" and had recently tested positive for other Sjogren's syndrome indicators. <u>Id.</u> at 332. Dr. Thornburn's report, like Dr. Yuen's, recommended that Plaintiff be limited to five consecutive hours of sitting, one hour of standing, and one hour of walking per day. <u>Id.</u> at 333.

United States District Court
For the Northern District of California

    In mid-October 2009, after reviewing Dr. Thornburn's initial report, Hartford asked Dr. Thornburn to complete a "Behavioral Functional Evaluation" form describing Plaintiff's limitations in greater detail.  Id. at 175-76, 874.  Dr. Thornburn returned the completed form on October 30, 2009.  Id. 175-76.  On it, she indicated that Plaintiff was "fearful of making mistakes in a job which previously was not a problem for her."  Id. at 874.  Dr. Thornburn also noted that "short deadlines will trigger her to worsen [sic] as well when previously she could thrive under such circumstances."  Id.

    A few months later, in January 2010, Hartford hired an investigative firm to conduct surveillance of Plaintiff and document her physical abilities.  Id. at 37-69.  The firm conducted six full days of surveillance between February and April 2010.  Id.  However, because Plaintiff rarely left her home on these days, the firm was only able to observe Plaintiff for a total of two and a half hours, most of which Plaintiff spent at the grocery store and the dentist's office.  Id. at 37-69, 1948-49.  The firm recorded thirty minutes of video footage of Plaintiff traveling to and from these appointments.  Id.

    On July 22, 2010, a Hartford investigator interviewed Plaintiff at her home and showed her the surveillance footage.  Id. at 72-87.  Plaintiff told the investigator that the footage accurately depicted her physical capabilities and limitations.  Id. at 82.  However, she also described various non-physical limitations -- such as her inability to sustain focus and "brain fog" -- which might not be easily documented on video.  Id. at 78.

In September 2010, Hartford nurse Marylou Watson reviewed Plaintiff's file, including Plaintiff's medical records and the surveillance footage. Id. at 190. She concluded that "there does not appear to be clinical evidence to support the self reports of fatigue and lack of functionality." Id. She then sent copies of the surveillance footage to Drs. Thai, Whalen, and Thornburn in November 2010 and asked them to evaluate Plaintiff's physical limitations after viewing the footage. Id. at 255-60. Dr. Thai declined to respond. Id. at 1408. Dr. Whalen responded by stating that, in his opinion, Plaintiff was not able to return to work. Id. at 581-82. Dr. Thornburn provided the most detailed response; she noted that, while Plaintiff could likely perform forty hours of sedentary work per week, she would not be "able to function at the same cognitive ability as she had prior to spring, 2009, when she was gainfully employed." Id. at 1406.

In December 2010, after receiving these responses, Hartford hired a neuropsychologist, Dr. Joseph Ricker, to conduct an "independent medical review" of Plaintiff's file. Id. at 196-97. Dr. Ricker spoke to Drs. Whalen and Thornburn and reviewed Dr. Karzmark's August 2010 report on Plaintiff's cognitive abilities. Id. at 574-79. He concluded that, even though some of Plaintiff's neuropsychological abilities were below average, "the vast majority of [her] performance on the 8/25/2010 neuropsychological evaluation was within normal limits and not suggestive of a cognitively or emotionally based impairment." Id. at 577 (repeated at 578). In January 2011, Dr. Ricker submitted a report to Hartford summarizing his conclusions. Id. at 574-79.

Two weeks later, on January 18, 2011, Hartford sent Plaintiff a letter notifying her that it was terminating her LTD benefits under the "own occupation" standard. Id. at 102-09. Hartford explained that its decision was based on "inconsistencies between your reported limitations and observed activities and the medical documentation provided in our file." Id. at 106. The letter concluded by stating that Plaintiff appeared able to perform "sedentary work" and, thus, should be "able to physically and mentally perform [her] duties." Id. at 108.

IV.  Social Security Administration Award

On January 31, 2011, Plaintiff was notified that the Social Security Administration (SSA) had approved her claim for disability benefits, which she had filed more than two years earlier. Id. at 1379-83. Hartford had assisted Plaintiff in filing her SSA claim in 2010 by referring her to a law firm it often uses to help its claimants apply for SSA benefits. Id. at 188, 191. In February 2011, when the firm learned that Plaintiff's SSA claim had been approved, it immediately contacted her to notify her that Hartford may be entitled to a share of her SSA benefits. Id. at 1385.

In a letter dated February 10, 2011, the firm explained, "Even though Hartford is no longer paying you a monthly benefit, you may still owe some of [your SSA award] to them under the terms of your policy. You may owe them for any months in which you received a check from Hartford, and a retroactive check from SSA." Id. Subsequent letters instructed Plaintiff to use her SSA benefits to reimburse Hartford for its past LTD payments to her. Id. at 1349. In March 2011, Plaintiff wrote a letter notifying

United States District Court
For the Northern District of California

1  Hartford that she planned to reimburse the company and asking

2  whether Hartford's reimbursement requests constituted an

3  "acknowledgement by the Hartford that I have been and remain

4  disabled under the Policy." Id. at 203-04, 1349.  She also asked

5  whether Hartford planned to "thoroughly review the records in

6  [her] Social Security file." Id. at 1349.  The AR does not

7  indicate whether Hartford ever responded to these inquiries.

8  V.   Plaintiff's Appeal

9       On July 14, 2011, Plaintiff notified Hartford of her intent

10 to appeal its termination decision. Id. at 422-437.  She also

11 provided Hartford with declarations of support from friends and

12 family, id., and new materials documenting her disability.

13      For instance, Plaintiff submitted a letter from Dr.

14 Chakravarty, dated June 29, 2011, stating that she continued to

15 suffer from fatigue, dry eyes and mouth, joint pain, and diarrhea.

16 Id. at 725-26.  In the letter, Dr. Chakravarty noted that

17 Plaintiff's treatment for these ailments was ongoing but, thus

18 far, had yielded only "limited improvement." Id.  Dr. Chakravarty

19 also expressed surprise that Hartford never contacted her to

20 discuss Plaintiff's condition before terminating Plaintiff's

21 benefits. Id.

22      In addition to the letter from Dr. Chakravarty, Plaintiff

23 submitted the results of a two-day Work Tolerance

24 Screening/Functional Capacity Evaluation (WTS/FCE) that she

25 attended in May 2011. Id. at 402-21.  The screening tested

26 Plaintiff's ability to perform work-related tasks such as reading,

27 typing, and problem-solving. Id.  The report summarizing

28 Plaintiff's WTS/FCE performance stated that her "ability to

United States District Court
For the Northern District of California

perform fast-paced, intellectually demanding work tasks on a full-time basis is compromised by the physical and mental limitations that have evidently developed since her diagnosis with Sjogren's disease." Id. at 420.  According to Dr. Chakravarty's letter, these observed limitations were "consistent with those reported by Ms. Stout to me and to her other medical providers." Id. at 726.

Plaintiff also submitted the results of a neuropsychological evaluation conducted by Dr. Ronald Ruff at the University of California, San Francisco, in June 2011. Id. at 1196-219.  Dr. Ruff interviewed Plaintiff and reviewed her medical records, focusing on Dr. Karzmark's August 2010 evaluation. Id. at 1196. His July 2011 report concluded, "Given her physical and psychiatric status, Ms. Stout is unable to return to her former profession or be competitively employed in a comparable vocation." Id. at 1219.

Shortly after receiving notice of the appeal, Hartford retained two of its own experts to review Plaintiff's file.  The first was rheumatologist Dr. Brian Peck, who submitted a report in August 2011 concluding that Plaintiff's self-reported physical symptoms were not supported by the information in her medical file. Id. at 309-17.  Dr. Peck's analysis was based on a review of Plaintiff's medical records and a telephone conversation with Plaintiff's former rheumatologist, Dr. Thornburn. Id. at 310.  He did not speak to Dr. Chakravarty.  In his report, Dr. Peck noted

11

United States District Court
For the Northern District of California

that Plaintiff may need to be limited to "light work"[3] if she returned to her job but otherwise still had the "ability to perform work activities on a full-time, sustained basis." Id. at 317.

Hartford's second expert, neuropsychologist Dr. Milton Jay, also submitted a report to Hartford in August 2011. His report was based on a review of Plaintiff's medical records and a telephone conversation with Dr. Whalen. Id. at 319-22. In Dr. Jay's report, he states that he "did not see adequate support that depression or cognitive disorder was sufficiently severe, as of January 2011 and forward in time, that this woman [i.e., Plaintiff] could not consistently perform work activities for eight hours per day, 40 hours per week on a sustained basis." Id. at 326. He also expressed his belief that she had the "capacity to perform activities such as designing systems, collecting and analyzing data, perform in a highly technical capacity, meet deadlines, be innovative, and work at a high level in the workplace." Id. at 326-27. Dr. Jay placed special emphasis on Dr. Karzmark's August 2010 examination, noting that "the findings in attention/concentration, memory, and processing speed appeared to be unexpectedly low for this woman" given her education and employment history but, nevertheless, should not prevent her from

---

[3] Dr. Peck's report relies on the definition of "light work" set forth in the Department of Labor's (DOL) Dictionary of Occupational Titles. Because the parties failed to provide this definition, the Court takes judicial notice of DOL's publicly available "light work" definition: "Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects." DOL, Dictionary of Occupational Titles, App'x C, at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

returning to work.  Id. at 324-25.  Dr. Jay also highlighted Dr. Whalen's opinion that Plaintiff's depression was relatively mild, noting that "[s]uch depression would not be expected to provide a significant threat to this woman's functionality."  Id. at 323.

After reviewing all of the material produced during the appeal, Hartford upheld its prior decision to terminate Plaintiff's benefits.  It issued a final letter denying Plaintiff's appeal on September 12, 2011.  Id. at 215-25. Plaintiff filed this lawsuit three months later.

CONCLUSIONS OF LAW

I.  Legal Standard

To decide cross-motions for judgment under Federal Rule of Civil Procedure 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting evidence and deciding which is more likely true.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999).

The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan.  Absent contrary language in the plan, the denial is reviewed under a de novo standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  However, if "the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," the administrator's decision is reviewed for abuse of discretion.  Id. at 102.  The parties here agree that the Policy confers discretion upon Hartford and, therefore, requires the Court to apply the abuse of discretion standard.

United States District Court
For the Northern District of California

Under this standard, the administrator's decision will typically be upheld if it is reasonable and supported by substantial evidence in the administrative record as a whole. McKenzie v. General Tel. Co. of Cal., 41 F.3d 1310, 1316-17 (9th Cir. 1994).  However, if the plan administrator is also the plan funder, then the court must take account of this conflict of interest and "review the administrator's stated bases for its decision with enhanced skepticism."  Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009).  In those circumstances, abuse of discretion review must be "tempered by skepticism commensurate with the plan administrator's conflict of interest."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 959 (9th Cir. 2006) (en banc).  As the Ninth Circuit explained in Abatie,

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id. at 968-69.  The Supreme Court relied on similar logic in Metropolitan Life Insurance Co. v. Glenn, holding that a plan administrator's conflict of interest should be "weighed as a factor in determining whether there is an abuse of discretion." 554 U.S. 105, 115 (2008) (quotation marks omitted); see also Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016,

14

1024 (9th Cir. 2008) (noting that the <u>Glenn</u> framework is "similar to the one provided in <u>Abatie</u>").

In this case, because Hartford is both the Policy administrator and the funding source for benefits paid under the Policy, it operates under a structural conflict of interest. <u>See</u> <u>Abatie</u>, 458 F.3d at 966 (noting that "such an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers"). This conflict merits special emphasis here because it appears to have tainted Hartford's decision-making process.

In <u>Montour</u>, the Ninth Circuit identified several possible "signs of bias" that would justify giving significant weight to a plan administrator's conflict of interest. 588 F.3d at 632-33. These include the absence of administrative "procedures to help ensure a neutral review process"; the administrator's "decision to conduct a 'pure paper' review" of the claimant's medical records rather than an in-person medical evaluation; and the administrator's "failure to grapple with the SSA's contrary disability determination." <u>Id.</u> at 633-35. Hartford's review process suffered from all of these deficiencies.

First, just as it did in <u>Montour</u>, Hartford failed "to present any extrinsic evidence of any effort on its part to 'assure accurate claims assessment.'" <u>Id.</u> at 634. The company has not identified any steps that it took to "wall[] off claims administrators from those interested in firm finances" or to impose "management checks that penalize inaccurate decisionmaking." <u>Glenn</u>, 554 U.S. at 117. "While Hartford was not

United States District Court
For the Northern District of California

required to present evidence demonstrating its efforts to achieve claims administration neutrality, the Supreme Court's decision in [Glenn] placed it on notice as to the potential significance of such evidence in defense of a suit by a claimant challenging an adverse benefits determination." Montour, 588 F.3d at 634 (citing Glenn, 554 U.S. at 116-17).

Second, Hartford's termination decision here was based on a "pure paper" review. Id. at 634. None of Hartford's medical experts examined Plaintiff in person. In fact, they failed even to speak with her treating physician, Dr. Chakravarty, about her condition.[4] This failure "'raise[s] questions about the thoroughness and accuracy of the benefits determination.'" Id. (alteration in original; citing Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008)). As the Supreme Court has noted, a plan administrator's reliance on independent experts raises "serious concerns" about its impartiality when those experts lack access to "all of the relevant evidence." Glenn, 554 U.S. 106-07.

Third, Hartford failed to address adequately the SSA's determination that Plaintiff suffered from a disability. Although Hartford noted in its September 2011 denial that the SSA uses a different disability definition than Hartford, it did not address any of the SSA's specific findings. AR 224. The Montour court

---

[4] Hartford notes that its rheumatology expert, Dr. Peck, attempted to contact Dr. Chakravarty "but was unable to reach her despite numerous attempts." Docket No. 57, Cross-Mot. J., at 9. However, the fact that Dr. Peck attempted to reach Dr. Chakravarty does not absolve Hartford of its obligation to conduct a thorough review of Plaintiff's claim. If anything, Dr. Peck's admission that he failed to speak to Dr. Chakravarty, AR 309, should have put Hartford on notice that his analysis was potentially incomplete.

**United States District Court**
For the Northern District of California

held that this is inadequate, noting, "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied."  588 F.3d at 636 ("While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" (citations omitted)).  Hartford's failure to review the SSA decision is particularly egregious here, given that Plaintiff expressly asked Hartford to do so and even offered to make her SSA file available to Hartford.  AR 1349.

What's more, Hartford actively encouraged Plaintiff "to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (being entitled to receive an offset from her retroactive Social Security award), and then ignored the agency's finding in concluding that she could do sedentary work."  Glenn, 554 U.S. at 118.  In Glenn, the Supreme Court held that this identical "course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict" because the insurer's "seemingly inconsistent positions were both financially advantageous."  Id. (emphasis added); see also Montour, 588 F.3d at 635 ("Ultimately, Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's

decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding.").

The only significant difference between Hartford's administrative review process here and the one it used in Montour is that Hartford relied less heavily on surveillance footage in this case.  While Plaintiff contends that Hartford "blew [the footage] out of proportion," Hartford's letter denying Plaintiff's benefits barely mentions the footage and does not appear to place significant weight on it.  Nevertheless, the various other "signs of bias" in Hartford's decision-making process require that this Court "accord significant weight to the conflict."  588 F.3d at 634.

II.  Plaintiff's Disability Claim

Plaintiff seeks review of Hartford's termination decision under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a).  This provision allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  Id.

A.  "Own Occupation" Standard

Hartford's decision to terminate Plaintiff's benefits was made under the "own occupation" standard.  The decision was based principally on the opinions of three experts: Dr. Ricker, who submitted a report to Hartford in January 2011 just before it issued its initial termination decision, and Drs. Peck and Jay, who submitted reports in August 2011 shortly before Hartford

**United States District Court**
For the Northern District of California

denied Plaintiff's appeal.  Because each of these experts failed to examine Plaintiff and discounted the opinions of Plaintiff's treating physicians without explanation, Hartford's reliance on their opinions constitutes an abuse of discretion.  See, e.g., Caplan v. CNA Financial Corp., 544 F. Supp. 2d 984, 992 (N.D. Cal. 2008) (finding abuse of discretion where plan administrator "discounted a wealth of evidence that Plaintiff was not able to perform the duties of his occupation").

Dr. Ricker, for instance, focused solely on Plaintiff's cognitive impairment and never evaluated the evidence of her physical symptoms.  Indeed, he expressly stated in his report that he was "not in a position to address any physical limitations or restrictions."  AR 577.  Furthermore, even though his conclusions were based almost entirely on the results of Plaintiff's August 2010 cognitive evaluation, Dr. Ricker never explained why his interpretation of those results differed so widely from those of Dr. Karzmark, who actually administered the evaluation.  Dr. Ricker's conclusion that the "vast majority" of Plaintiff's results were "within normal limits," id., seems squarely at odds with Dr. Karzmark's conclusion that Plaintiff's "overall performance on the battery was at the 30th percentile" among people of her age and education level.  Id. at 1419 (finding that Plaintiff's "Performance IQ is low for [her] sociodemographic expectation").  Although Dr. Ricker states that the "presence of occasional statistically below average performances on large batteries of neuropsychological tests is not at all uncommon even among neuropshycologically intact individuals," id. at 577

United States District Court
For the Northern District of California

(emphasis added), he does not explain why Plaintiff performed below average in <u>several</u> different testing areas.

Hartford's other neuropsychologist, Dr. Jay, was more candid in his analysis, noting that Plaintiff's test scores on the August 2010 cognitive evaluation were "unexpectedly low" for someone of her education level and employment history. <u>Id.</u> at 324-25. But, while Dr. Jay acknowledged that Plaintiff's condition "would likely result in some mild inefficiency for cognitively demanding work," <u>id.</u> at 324, he still concluded that she was not "prevented from working altogether," <u>id.</u> at 326. Critically, Dr. Jay reached this conclusion without reviewing any of the "raw data" from the August 2010 cognitive evaluation. <u>Id.</u> This oversight is significant because Dr. Jay's report challenged the conclusions of two different neuropsychologists, Drs. Karzmark and Ruff, who actually met with Plaintiff and analyzed the raw data. Hartford's failure to provide Dr. Jay with this data -- and subsequent decision to rely on his report -- indicate that it abused its discretion. <u>See</u> <u>Glenn</u>, 554 U.S. at 118 (noting the importance of ensuring that "independent vocational and medical experts" have access to "all of the relevant evidence").

Hartford's third expert, Dr. Peck, also relied on incomplete information in his report on Plaintiff's physical limitations. As noted above, Dr. Peck never personally examined Plaintiff nor spoke to her treating rheumatologist, Dr. Chakravarty. <u>See</u> <u>Oster v. Standard Ins. Co.</u>, 759 F. Supp. 2d 1172, 1188 (N.D. Cal. 2011) (finding abuse of discretion where "none of [the administrator]'s physician reviewers ever contacted or spoke with [the claimant]'s treating physicians to ascertain the current state of his

20

United States District Court
For the Northern District of California

condition"). His report, which did not discuss Dr. Chakravarty's June 2011 letter, consisted mostly of short summaries of tests and analyses conducted by other doctors. AR 309-15. Dr. Peck's own analysis of Plaintiff's health was brief -- eleven sentences long -- and repeatedly stated that any disability "due to depression and cognitive defects is beyond [his] area of expertise." Id. at 316-17. Most importantly, the report never addressed the fact that Plaintiff's treating physician -- who produced many of the records on which Dr. Peck relied -- reached a different conclusion than he did about Plaintiff's ability to return to work. See generally Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (holding that, although plan administrators need not "accord special weight to the opinions of a claimant's physician," they may not "arbitrarily refuse to credit" those opinions either). Dr. Peck made no attempt to explain why he reached a different conclusion from Plaintiff's treating physicians.

In sum, Hartford's expert reports suffer from several common shortcomings. Each report analyzed Plaintiff's physical and cognitive symptoms in isolation, without considering their cumulative effect on Plaintiff's ability to perform her job. Furthermore, each report was based on a review of Plaintiff's medical records rather than an in-person medical examination. Finally, none of the reports made any serious effort to discredit Plaintiff's WTS/FCE results or distinguish the contrary findings of Plaintiff's treating physicians and the SSA.

Hartford's reliance on these flawed reports therefore shows that it abused its discretion in terminating Plaintiff's claim for

United States District Court
For the Northern District of California

LTD benefits under the "own occupation" standard.  <u>Caplan</u> 544 F.

Supp. 2d at 991-93 (holding that a plan administrator abused its

discretion by relying on an expert report that showed a "total

disregard for the conclusions of Plaintiff's treating physicians"

and failed to credit the "objective evidence of [the claimant]'s

condition, including the results of the WTS/FCE").  The Ninth

Circuit has likewise held that similar conduct by plan

administrators constitutes an abuse of discretion.  <u>See</u> <u>Montour</u>,

588 F.3d at 637; <u>Sterio v. HM Life</u>, 369 Fed. App'x 801, 803-05

(9th Cir. 2010) (finding abuse of discretion where plan

administrator had a conflict of interest and "failed to credit []

reliable medical evidence," "failed to distinguish or even

acknowledge the SSA's contrary disability determination," and

"failed to conduct an in-person medical evaluation"); <u>Chellino v.</u>

<u>Kaiser Foundation Health Plan, Inc.</u>, 352 Fed. App'x 164, 167 (9th

Cir. 2009) ("Given Aetna's inherent conflict of interest, reliance

on unsupported evidence, and failure to credit evidence not so

flawed, Aetna's decision to terminate Chellino's benefits was an

abuse of discretion.").

     B.   "Any Occupation" Standard

     Plaintiff contends that she is entitled to LTD benefits under

the "any occupation" standard.  This argument fails for two

reasons.

     First, the AR does not contain sufficient information to

determine whether or not Plaintiff is entitled to benefits under

this standard.  Plaintiff's own medical evidence focuses primarily

on the effect that her condition has had on her ability to perform

the duties of a senior level computer programmer with supervisory

responsibilities.  Her evidence does not specifically address her ability to perform the various other jobs for which she might be qualified.

Second, even if the AR did contain sufficient information to determine whether Plaintiff was disabled under the "any occupation" standard, the Court would still lack the authority to make that determination.  The Ninth Circuit has held that when a plan administrator abuses its discretion by terminating disability benefits under a specific disability standard, the reviewing court may only reinstate those benefits under the same standard.  Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Income Plan, 85 F.3d 455, 460 (9th Cir. 1996) ("[T]o the extent the district court ordered payments beyond the initial 24-month disability period, it was error to do so."); Frost v. Metropolitan Life Ins. Co., 320 Fed. App'x 589, 592 (9th Cir. 2009) ("[Plaintiff] is entitled only to the benefits she was wrongly denied under the remainder of the plan's 'Own Occupation' period.").  Here, Hartford terminated Plaintiff's claim under the "own occupation" standard and did not address whether she would qualify for benefits under the higher "any occupation" standard.  Accordingly, Plaintiff's claim must be remanded to Hartford for a determination of whether she qualifies for LTD benefits under the "any occupation" standard.  See Caplan, 544 F. Supp. 2d at 994 ("Plaintiff's claim for additional long-term disability benefits is REMANDED to Hartford for further proceedings consistent with this order.").

CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment (Docket No. 50) is GRANTED with respect to her claim

United States District Court
For the Northern District of California

under the "own occupation" standard and DENIED with respect to her claim under the "any occupation" standard.  Defendants' cross-motion for judgment (Docket No. 57) is DENIED.  Defendants' evidentiary objections are DENIED as moot because the Court has not relied on the evidence they address.

The Court finds that Plaintiff is eligible for LTD benefits under the "own occupation" standard applicable to the first twenty-four months of her LTD claim and orders Defendants to pay any of those benefits that remain unpaid, plus prejudgment interest thereon.[5]  Hartford should calculate the amount of past benefits and interest due in the first instance.  After Hartford has made this calculation, the parties shall file a stipulated form of judgment.  This stipulated form of judgment must be filed within twenty-one days of this order.  If a dispute concerning the amount due arises and cannot be resolved without the Court's intervention, the parties may move for appropriate relief.  If Plaintiff seeks an award of attorneys' fees, she must file a separate motion and must support the request with appropriate documentation, including billing records and a lodestar figure.

Plaintiff's claim for additional LTD benefits is REMANDED to Hartford to determine whether Plaintiff is disabled under the Policy's "any occupation" standard.  Because Hartford has not yet issued a decision under that standard, there will be no live

---

[5] Prejudgment interest shall be calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment."  28 U.S.C. § 1961(a); see also Blankenship v. Liberty Life Assurance Co. of Boston, 486 F.3d 620, 628 (9th Cir. 2007) (noting that "'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest'" (citations omitted)).

dispute remaining between the parties after judgment enters in this matter.  Accordingly, this case will be closed once judgment enters.  If Plaintiff subsequently seeks to challenge Hartford's decision under the "any occupation" standard, she will need to file a new complaint and may seek to relate it to this case.

    IT IS SO ORDERED.


Dated: 8/28/2013

CLAUDIA WILKEN
United States District Judge